# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KAYLEE EVELER ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **No. 16-14776** |
| **FORD MOTOR CO.** | **SECTION I** |

## ORDER AND REASONS

Ford moves[1] to exclude the opinions of engineer Paul Semones under Rule 702 of the Federal Rules of Evidence. Semones offers the opinion that Ford's Explorer SUV has a design defect that causes it to be prone to rollovers and that the design defect caused the rollover accident that injured the plaintiff. For the following reasons, Ford's motion is denied.

## I.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

---

[1] R. Doc. No. 32.

(d) the expert has reliably applied the principles and methods to the facts of the case.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Hicks*, 389 F.3d at 524; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (discussing witnesses whose expertise is based purely on experience). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.*; *see Daubert*, 509 U.S. at 596.

*Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires a trial court to make a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see Kumho Tire*, 526 U.S. at 147.

A number of nonexclusive factors may be relevant to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the techinque's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'"). "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

With respect to determining the relevancy of an expert's testimony pursuant to Rule 702 and *Daubert*, the proposed testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from

3

those having a specialized understanding of the subject involved in the dispute." *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note).

The Court applies a preponderance of the evidence standard when performing its gatekeeping function under *Daubert*. *See Daubert*, 509 U.S. at 592 n.10. The Court is not bound by the rules of evidence—except for those with respect to privileges—when doing so. *See id.*

## II.

Ford challenges Semones's qualifications. Semones is a forensic engineer; Ford suggests that he lacks the expertise to opine on vehicle design as he has not designed a vehicle. The Court rejects Ford's argument, which at times verges rather close to the self-serving suggestion that only employees of car manufacturers are qualified to opine on the safety of their vehicles.

Rule 702 does not require an expert to have the perfect possible credentials to testify as an expert. *See Bell v. Foster Wheeler Energy Corp.*, No. 15-6394, 2016 WL 5847124, at *2 (E.D. La. 2016). Accordingly, courts "have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (Becker, J.). Thus, "if the witness has qualifications in the general field related to the subject matter in question," then "the witness need not have specialized expertise in the area directly pertinent to the issue in question." *Guzman v. Memorial Hermann Hosp. Sys.*, No. 07-3973, 2008 WL 5273713, at *15 (S.D. Tex. 2008) (Rosenthal, J.).

4

Semones—an engineer who has devoted extensive time to studying rollover accidents—more than meets that standard. *See Perez-Hernandez v. Mitsubishi Motors Corp.*, No. 03-1269, 2005 WL 6003534, at *2 (N.D. Ga. 2005) (engineer that studies rollovers qualified to opine on issue). The mere fact that Semones has not designed an automobile does not prevent him from being able to offer expert testimony as to the cause of a rollover accident. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 245 (3d Cir. 2008) (observing that an expert "did not need to be substantively qualified in the design of automobile" to opine as to safety of the automobile and the adequacy of the warnings provided). And to the extent that there are any shortcomings with respect to Semones's academic training, his long study of rollovers more than compensates. *See Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 800 (E.D. La. 2011); *see also In re Paoli*, 35 F.3d at 754 ("If the liberal standard of Rule 702 allows an engineer who teaches auto mechanics to testify in a products liability action about tractors, *see Hammond v. International Harvester Co.*, 691 F.2d 646 (3d Cir. 1982), . . . it surely allows a trained internist who has spent significant time reviewing the literature on PCBs to testify as to whether PCBs caused illness in plaintiffs.").

That is not to say that Semones has perfect qualifications. But because Semones's qualifications more than meet Rule 702's liberal standard for qualifications, Ford's objections to his qualifications go to the weight that Semones's testimony should be accorded, not its admissibility. *See, e.g.*, *Vedros v. Northrup Grumman Shipbuilding, Inc.*, 119 F. Supp. 3d 556, 562 (E.D. La. 2015).

**III.**

Semones's opinion is that the Ford Explorer had a design defect that caused it to be prone to rollovers and that the defect caused the rollover accident. Ford challenges that opinion's reliability.

Semones's expert opinion relies heavily on a car's "static stability factor." The static stability factor is a ratio that compares a vehicle's track width to the height of its center of gravity. (For the technically inclined, the equation is static stability factor = track width / (2 x center of gravity height).) All things considered, a higher static stability factor will result in an automobile having a lower propensity to rollover because it will have a broader track width for a particular center of gravity. *See Montgomery v. Mitsubishi Motors Corp.*, No. 04-3234, 2006 WL 1967361, at *2 (E.D. Pa. 2006) ("[T]he relationship between static stability factor and rollover risk . . . has been used by injury epidemiologists, biostatisticians and accident data analysts from NHTSA."). That said, no vehicle is rollover-proof, and vehicles with high static stability factors (*i.e.*, a Formula One car) can still rollover in the right conditions.

Semones's view is that the Ford Explorer had a design defect insofar as it had a static stability factor below 1.2. Thus, looking beneath the opinion's scientific veneer, Semones's ultimate conclusion is that the Ford Explorer's track width was too narrow for its particular center of gravity.

Semones arrived at 1.2 as the relevant number by analyzing National Highway Traffic Safety Administration data suggesting that a static stability factor above 1.2

6

results in a significantly reduced rollover risk. *See* R. Doc. No. 32-2, at 14; *see also* R. Doc. No. 32-2, at 24. Semones further links that conclusion to the Ford Explorer model at issue by pointing to a series of Ford Explorer tests wherein a driver—Robert Hooker (more on him later)—drove a series of standardized maneuvers in both "stock" Ford Explorers with a static stability factor below 1.2 and a "modified" Ford Explorer with a static stability factor of approximate 1.2. In those tests, the "stock" Explorer was prone to tipping to its outriggers, which are essentially tricycle wheels put on a vehicle when performing rollover tests to keep the vehicle from *actually* rolling over. Meanwhile the "modified" Ford Explorer did not tip to its outriggers while performing the same maneuvers. *See* R. Doc. No. 19-23. Finally, Semones examined the crashed Explorer, as well as evidence at the scene of the crash. and concluded that the evidence suggests that the vehicle rolled over because of its defective design. *See, e.g.*, R. Doc. No. 32-4, at 152:8-22-154:7.

Ford challenges Semones's reliance on Robert Hooker's Ford Explorer tests. Ford suggests Hooker's tests are methodologically flawed, and that Semones's reliance on those supposedly-flawed tests infect Semones's ultimate conclusions. In challenging Hooker's tests, Ford relies heavily on a District of Maryland opinion finding Hooker's testing of a Ford Minivan unreliable. *See Samuel v. Ford Motor Co.*, 96 F. Supp. 2d 491, 502-504. (D. Md. 2000), *aff'd sub. nom., Berger v. Ford Motor Co.*¸95 F. App'x 520, 522 (4th Cir. 2004) ("After considering the briefs of parties, their oral arguments, and the joint appendix, we affirm on the reasoning of the district court.").

7

The Court rejects Ford's challenge to Semones's reliance on Hooker. Semones is not solely relying on Hooker's test results. *See, e.g.*, R. Doc. No. 32-2, at 14, 24 (NHTSA data). Thus, even if Ford's attacks on Hooker hit home, that would only get Ford so far.

Further, *Samuel*'s—and by extension Ford's—attacks on the Hooker test data are only so helpful here. The tests at issue in this case are different. *See* R. Doc. No. 32-4, at 94:18-:23 (Semones explaining that he was focusing on "fishhook" test results in this matter); R. Doc. No. 32-4, at 96:18-97:14 (Semones noting methodological flaws with early Hooker test data, and explaining that he would not want to solely rely on certain non-standardized Hooker tests). For example, the defendant in *Samuel* only sought to exclude—and therefore the *Samuel* court only considered—certain accident avoidance maneuver tests that Hooker performed modeled on Consumer Union's— the well-regarded independent non-profit that publishes *Consumer Reports*—short course tests for rollover propensity. *See, e.g.*, *Samuel*, 96 F. Supp. 2d at 500 ("The scope of Ford's Motion No. 6 is quite narrow. It seeks only to prevent . . . [testimonty] about the results of . . . MSAI testing performed on the Aerostar van. It does not seek to preclude . . . otherwise admissible testimony about other AM testing he did on the Aerostar, such as the 'J–Turn' test."); *see also id.* at 494 ("Although the MSAI AM test has not been the subject of independent review, it shares many features with the CU Short Course, which has been the subject of critical review.").

So *Samuel*—which analyzed MSAI tests performed on a minivan and not a Ford Explorer—really is no precedent at all for Ford's challenge to Semones's reliance

on Hooker's version of other widely-used rollover tests such as the J-Turn and the Fishhook.[2] *See, e.g.*, R. Doc. No. 32-2, at 19. And the widespread use and general acceptance of such tests—after all, even Ford's brief concedes that "*the J-Turn test and the Fishhook test, were the most objective tests of the susceptibility of vehicles to maneuver-induced on-road rollover, and had the highest levels of objectivity, repeatability and discriminatory capability*," R. Doc. No. 32-1, at 15 (emphasis in original) (internal quotation marks omitted))—convinces the Court that there is no basis under *Daubert* for excluding Semones from testifying as to the results of those tests.

Indeed, even when the Court solely considers the Hooker tests potentially implicated by *Samuel*—*i.e.*, the ones based on the CU short course methodology—the Court concludes that those tests survive *Daubert*. *See, e.g.*, *Zachary v. Bridgestone/Firestone, Inc.*, No. 01-531, 2005 WL 6019653, at *3 (N.D. Ga. 2005) (explaining that the "methods and results" of CU short course testing "are discernible and rooted in real science"). Yes, the CU short course methodology is not perfect insofar as certain other factors such as driver input, breaking, and tire conditions can have a significant influence on the results. And, yes the NHTSA thinks that there are better rollover propensity tests out there. *See, e.g.*, *Samuel*, 96 F. Supp. 2d at 495-98. But neither governmental acceptance nor perfect reliability are prerequisites for admissibility under *Daubert*, and the fact that the CU short course methodology

---

[2] The NHSTA, for a time, also referred to the "fishhook" test as the "road edge recovery" test. *See* R. Doc. No. 32-2, at 16-17.

was developed by an independent consumer organization for the purpose of informing auto purchasing decisions weighs in favor of admissibility.

Further, unlike the showing it made in *Samuel*, Ford critically does not bother to build a sustained methodological attack with supporting evidence against the tests relied on here. *Compare* 96 F. Supp. 2d at 502 (noting attack from Ford expert on tests at issue in *Samuel*). Simply citing a seventeen-year old case analyzing certain minivan tests and expecting the Court to fill in all of the blanks—or assume that nothing has changed in the intervening decade-and-a-half—is a less-than-helpful litigation strategy and Ford cannot outsource its work in that regard to the Court. After considering the applicable *Daubert* factors as well as the record evidence and arguments submitted *in this matter*, the Court concludes that—on balance—Hooker's test runs based on the CU short course methodology are sufficiently reliable and based in science to be admissible.[3]

## IV.

Finally, Ford challenges the "fit" of Semones's tests and opinions to this case. Ford suggests that Semones's opinions do not "fit" the case because the rollover tests do not mirror conditions on the day of the accident and that Semones does not

---

[3] Though not necessary to the Court's conclusion, the Court observes that the methodological flaws of the CU short course can be easily understood and contextualized by lay-persons. Therefore the Court sees little risk that the jury will ascribe false precision to the short course results. Instead, the Court fully expects that the jury will be able to properly contextualize the evidence as one test among many—each of which has its own advantages and disadvantages—when finding the facts in this case.

consider alternative plausible explanations for the accident. That argument does no better than Ford's attacks on the Hooker tests.

In the first place, *Daubert* does not require the plaintiffs to shut down I-10 in the middle of the day so that they can run a series of controlled driving tests at the exact point the accident happened. *Cf. Bell v. Foster Wheeler Energy Corp.*, No. 15-6394, 2016 WL 5916304, at *2-3 (E.D. La. 2016) (studies do not have to be of identical circumstances to be of assistance to the jury and satisfy the fit and reliability prongs of *Daubert*). All that matters is that the studies and Semones's opinion related thereto be of "some use to the jury" in judging whether a rollover would not have occurred had the Explorer's static stability factor been higher. *Id.* at *2. Plaintiffs easily make that showing.

But even more importantly, Ford's "fit" arguments—which largely turn on which version of the predicate facts that the jury accepts—are based on a false premise. It is for the jury—and not this Court—to judge which version of the predicate facts the jury believes is accurate, and then use those facts when deciding whether to credit Semones's opinion. *See, e.g.*, *Pipitone*, 288 F.3d at 250 ("[W]hile exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits. In this case, we conclude that the standard of reliability that the district court applied to Dr. Coco's testimony was overly stringent. The fact-finder is entitled to hear Dr. Coco's testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on

credibility, including whether the predicate facts on which Dr. Coco relied are accurate.").

The Court sees little reason why the jury would have to be protected from Semones's opinions or the test results. Ford's ultimate contention—that driver impairment and off-road tripping may cause certain rollover accidents regardless of the car's static stability factor—is so blindingly obvious that the Court sees little risk that the jury would somehow afford Semones's conclusions undue weight if it found the predicate facts to be in Ford's favor.

Accordingly,

**IT IS ORDERED** that the motion in limine is **DENIED**.

New Orleans, Louisiana, June 13, 2017.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**