**KAYLEE EVELER ET AL.**                                CIVIL ACTION

**VERSUS**                                                        No. 16-14776

**FORD MOTOR CO.**                                      SECTION I

<u>**ORDER AND REASONS**</u>

Two years ago, Luis and Kaylee Eveler were driving on I-10 with two of their children. Luis was at the wheel of the family's Ford Explorer. A vehicle allegedly encroached on the Evelers' lane. Luis swerved to avoid it, and then turned again. The Explorer rolled over. All four Evelers were ejected from the vehicle. Their lives would never be the same.

Luis and Kaylee ended up homeless. The children went into foster care. And Kaylee may never fully recover from her debilitating injuries.

It took nine months after the accident for Luis to obtain stable employment as a plumber. Luis's job provided the Evelers with the means to get off the streets. With a roof over their heads, Luis and Kaylee were able to regain custody of their children last Christmas.

Such a tragedy is inevitably accompanied by the apportionment of blame. The Evelers believe that the design of their Ford Explorer was at least partly to blame for the crash. So they sued Ford, alleging that the design of the Explorer made it unreasonably prone to rolling over.

Ford disagrees and moves for summary judgment, arguing that the Evelers cannot demonstrate a viable alternative design for the Explorer that would have

prevented the Evelers' injuries. *See* R. Doc. No. 97. Because the Court agrees, the Court grants Ford's motion for summary judgment.

## I.

### A.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a

genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## B.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 148 (5th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"To qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). Additionally, Rule 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education." *Hicks*, 389 F.3d at 524; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (discussing witnesses whose expertise is based purely on experience). "A district court should refuse to allow an

3

expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.*; *see Daubert*, 509 U.S. at 596.

*Daubert* "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework, which requires a trial court to conduct a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see Kumho Tire*, 526 U.S. at 147.

A number of nonexclusive factors may be relevant to the reliability inquiry, including: (1) whether the technique has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the techinque's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see Runnels v. Tex. Children's Hosp. Select*

*Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has 'considerable leeway' in determining 'how to test an expert's reliability.'").  "Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under [Rule] 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000).

With respect to determining the relevancy of an expert's testimony pursuant to Rule 702 and *Daubert*, the proposed testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note).

The Court applies a preponderance of the evidence standard when performing its gatekeeping function under *Daubert*.  *See Daubert*, 509 U.S. at 592 n.10.  The Court is not bound by the rules of evidence—except for those with respect to privileges—when doing so.  *See id.*

## II.

All that remains in this case is a single design defect claim under the Louisiana Products Liability Act. *See* R. Doc. No. 35. To establish that a product is defective in design under the Louisiana Products Liability Act, a plaintiff must show—among other things—that "[t]here existed an alternative design for the product that was capable of preventing the claimant's damage." La. R.S. 9:2800.56.

The Evelers argue that their Ford Explorer was defectively designed because its track width is too narrow for its center of gravity. They rely on the Explorer's "static stability factor" to quantify that defect.

The static stability factor of a vehicle is a ratio that compares a vehicle's track width to the height of its center of gravity. (For the technically inclined, the equation is static stability factor = track width / (2 x center of gravity height).) All things considered, a higher static stability factor will result in an automobile having a lower propensity to roll over on the road because the car will be less top heavy.

That basic relationship—a higher static stability factor is correlated with a lower propensity to roll over on the road—is widely accepted. *See, e.g.*, Consumer Information Regulations; Federal Motor Vehicle Safety Standards; Rollover Prevention, 68 Fed. Reg. 34998-03, at 35019 (request for comments June 1, 2000); *Montgomery v. Mitsubishi Motors Corp.*, No. 04-3234, 2006 WL 1967361, at *2 (E.D. Pa. 2006). That is why, for example, NHTSA considers a vehicle's static stability factor when awarding its rollover star ratings. *See* Consumer Information; New Car Assessment Program; Rollover Resistance, 68 Fed. Reg. 59250-01, 59263 (final policy

statement Oct. 14, 2003). Even Ford concedes as much: a vehicle's center of gravity and track width "are very important factors in rollover stability." *Daubert* Hr. Tr. 111:22-23 (testimony of Donald Tandy).

The Evelers argue that the Ford Explorer had a design defect insofar as it had a static stability factor below 1.2. The Evelers rely on their forensic engineering expert, Paul Semones, to arrive at that figure. Semones arrived at 1.2 as the relevant number by analyzing NHTSA data suggesting that a static stability factor above 1.2 results in a significantly reduced rollover risk. *See* R. Doc. No. 32-2, at 14; *see also* R. Doc. No. 32-2, at 24.

Unsurprisingly, then, the Evelers' proposed alternative design is a Ford Explorer modified to have a static stability factor above 1.2. Achieving such a design is not all that hard—all it requires is lowering the Explorer body a bit and using a combination of spacers and rims to widen the track width. Semones offers the opinion that such a modified Explorer would not have similarly rolled over if put in the same position as the Evelers' Ford Explorer.

And that is where the Evelers' problems in this lawsuit begin.

## III.

### A.

Before diving into the *Daubert* analysis, it is helpful to briefly discuss the physics of rollover accidents. At the risk of overgeneralization, there are two main types of rollovers: tripped and untripped rollovers. *See, e.g.*, 68 Fed. Reg. at 35009.

A tripped rollover occurs when a vehicle's tires hit an external object and the vehicle trips over that object. The principle here is familiar to anyone that has ever tripped on an uneven New Orleans sidewalk: the crack stops your foot's forward progress, your center of gravity goes out beyond your base of support, and you topple over. The same phenomenon can happen to vehicles when they hit a curb, a pothole, or a guardrail. Tripped rollovers—while certainly hazardous to the occupants of a car—are somewhat less of a concern from a product design perspective simply because the trip can exert forces such that any vehicle—from a Porsche to a cement mixer—will inevitably roll over no matter how well designed. *See Daubert* Hr. Tr. 77:25-78:2 (testimony of Paul Semones).

One of the most common tripped rollovers is what is called a "furrow trip". A furrow trip begins when a vehicle slides off the road. The weight of the vehicle presses the tires into the ground and the vehicle essentially plows a trench through the dirt. That sets off a chain reaction that overwhelms the vehicle's inherent stability. As Ford's expert explained:

> When you've got thousands of pounds down on those tires, they dig trenches. When they do that they are expelling dirt.
> There has been studies to show that the lateral forces spike much higher than you get on pavement. That's because you're trying to push dirt out of the way. It's like being in a boat and trying to put your hand down in the water. The water moves pretty easy, but it doesn't move very easy at 55 miles an hour.
> So you have to give that mass energy to expel it, and that puts a force back in the vehicle and acts as a tripping mechanism. I've investigated crashes of passenger cars, sports cars, Ferraris that slid off a test track, dug in a couple inches and flipped over because the forces are very high.

*Daubert* Hr. Tr. 116:18-117:6 (testimony of Donald Tandy).

Untripped rollovers, by contrast, are maneuver-induced rollovers where a vehicle rolls over on the road without striking an object. Untripped rollovers are more concerning from a product design standpoint—though the parties dispute how much—because they are more directly attributable to a vehicle's design and handling characteristics.

## B.

Paul Semones, the Evelers' expert, has consistently offered the opinion that the Evelers' Explorer suffered from an *un*tripped rollover. His theory of how that rollover occurred, however, has changed.

Semones's first theory of the crash was that the Explorer suffered "an untripped, passenger-side leading rollover due to tire/pavement friction forces alone as a result of an emergency steering maneuver." R. Doc. No. 87-1, at 13. And Semones can hardly be blamed for reaching that conclusion: the police report issued after the crash depicted an untripped, on-road rollover:



R. Doc. No. 94-1, at 6.

Both sides now admit that the police report—and by extension Mr. Semones—was wrong in concluding that this was a passenger-side rollover. *See Daubert* Hr. Tr. 70:7-21; 76:16-77:5. Shortly after Mr. Semones issued his reports, the parties obtained body camera footage from the officer that responded to the crash. That body camera footage makes clear that not only did the Ford Explorer suffer a driver's side rollover, but also that the Explorer slid for a number of feet through I-10's median *before rolling over*. A little extra digging revealed that the Evelers' tire tracks through the median showed up on the Google Earth photos of the crash site:



R. Doc. No. 94-1, at 9 (diagram of Ford's accident reconstructionist).

The agreed-upon track through the median is problematic for Semomes's opinion that the rollover occurred because of a defect in the Ford Explorer. In particular, the Explorer's traverse of the median creates the significant possibility that the Explorer suffered from a furrow trip (rather than an untripped rollover on I-10's surface).

As a result, Semones had to alter his theory of how the crash occurred so that the Explorer's rollover would still be untripped (and therefore Ford still to blame).

Semones's new, post-body-cam theory of the crash was that the Evelers' Explorer was committed to rolling over before it left the pavement. Semones bases that opinion on his belief that the Explorer had achieved "two-wheel lift" before leaving the pavement. He further opines that the Explorer will inevitably roll when it achieves two-wheel lift. *See Daubert* Hr. Tr. 72:5-12; 75:18-76:4; 80:1-81:14; 85:3-16.

Color the Court skeptical. Both sides agree that the visible yaw marks extend over thirty feet into the median. *See Daubert* Hr. Tr. 70:22-71:1. So under Semones's theory of the crash, the Explorer manages to slide off the road, onto the shoulder, and then thirty feet into the median—all the while going sidewise on only two wheels— before rolling over. That seems more than unlikely.

The Court's skepticism is further heightened by the fact that Semones's evidentiary support for that theory is threadbare. He relies on a video he watched of a Ford Explorer rolling over, *Daubert* Hr. Tr. 75:18-76:4, but then concedes that the video was of a prior generation Ford Explorer with a different suspension, *Daubert* Hr. Tr. 78:3-7, and that he was unaware of the tire conditions on that vehicle, *Daubert* Hr. Tr. 79:12-25. He relies on testing data, *Daubert* Hr. Tr. 85:7-8, but then concedes that the very testing data on which he relies suggests that vehicles *can* achieve two-wheel lift without rolling over, *Daubert* Hr. Tr. 85:13-16. He relies on other Ford Explorer rollover incidents he investigated, but in at least one of the handful of cases to which he points the Court, the cause of the accident appears to be partially traceable to the driver falling asleep, *see* R. Doc. No. 63-11, at 15—a cause hardly attributable to the design of the Explorer. And even if each of those handpicked cases

involved two-wheel lift that transitioned to full rollover, those handful of crashes hardly establish Semones's ultimate conclusion—two-wheel lift inevitably leads to rollover—particularly given the sheer number of Ford Explorers on the road.

Nonetheless, despite this Court's significant concerns regarding Semones's opinion that this was an untripped, on-road rollover, the Court need not formally resolve that issue. Even if Semones's opinion that the Evelers' Ford Explorer suffered an untripped on-road rollover survives *Daubert*, his opinions regarding the modified Ford Explorer do not.

### C.

Both sides agree that the Evelers' Explorer was traveling roughly 70 mph when Luis Eveler initially swerved to allegedly avoid the encroaching vehicle. *See, e.g.*, *Daubert* Hr. Tr. 20:15-16. That, in turn, meant the Evelers' Explorer was hurtling sideways at somewhere between 48-59 mph when it went into I-10's grassy median. *See, e.g.*, *Daubert* Hr. Tr. 118:23 (Ford's calculation); *Daubert* Hr. Tr. 102:24-103:2 (Semones testifying that plaintiffs did not independently calculate the speed of the vehicle when it went off-road). Semones opines that a modified Explorer with a static stability factor above 1.2 would not have rolled over if put in the same situation.

The primary basis for Semones's opinion is a series of somewhat standardized maneuvers performed by test driver Robert Hooker. In essence, Hooker performed roughly the same maneuvers in a stock Ford Explorer and a modified Ford Explorer, and found that the modified Ford Explorer would not roll over when the stock Ford Explorer did roll over.

In response to Ford's first *Daubert* motion, R. Doc. No. 32, this Court initially found Semones's opinions based on the Hooker tests to be reliable, R. Doc. No. 54. But Ford's pretrial submissions made clear that Ford's *Daubert* motion "did not actually raise Ford's most relevant arguments against Semones." R. Doc. No. 85, at 6. When an unrelated continuance gave this Court the opportunity to hold a *Daubert* hearing to consider Ford's new arguments suggesting that Hooker's testing did not comply with the standardized methodology that Hooker purported to follow, this Court took the opportunity to reconsider its prior opinion in light of Ford's new evidence and arguments. *See* Fed. R. Civ. P. 54(b).

## 1.

There is nothing inherently wrong about one expert relying on another expert's opinions and/or data. Not only does Rule 703 explicitly contemplate such reliance, but also, as a practical matter, it happens in nearly every case. After all, an expert need not re-prove Newtonian physics to be able to testify regarding the causes of an automobile accident.

Nonetheless, it can be problematic in certain situations. For example, as a practical matter, the testifying expert may not know the testing procedures used to gather the data. And given that the party advancing expert testimony has the burden of demonstrating its reliability, *see Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016), unanswered questions regarding those methods by which data was obtained may render opinions regarding that data unreliable. This, unfortunately for the Evelers, is one of those situations.

Both weight and tire conditions are important variables when running rollover tests. *Daubert* Hr. Tr. 54:1-4, 56:8-14 (weight); *Daubert* Hr. Tr. 57:12-19, 104:1-109:5 (tire condition). Yet Semones knows neither the weights, *see Daubert* Hr. Tr. 48:16-18, 53:11-53, 55:13-56:7, nor the tire conditions of the vehicles tested by Hooker, *Daubert* Hr. Tr. 57:20-25. And even more problematic is the fact that Semones cannot answer important questions about Hooker's testing methodology.

For example, the main Hooker test that Semones relies on is Hooker's variant of the Fishhook test. *See Daubert* Hr. Tr. 9:6-7. Semones claims that Hooker was largely patterning his Fishhook testing on Toyota's Fishhook test. *See Daubert* Hr. Tr. 10:17-11:24. Under Toyota's methodology, a test driver drives the vehicle in a fishhook-shaped course in order to find out the "threshold of speed and steering inputs at which the vehicle will roll over through steering inputs alone." *Daubert* Hr. Tr. 10:14-16.

But Hooker did not follow that methodology when testing the modified Ford Explorer. Instead, he simply—with no explanation at all—stopped the test at 45 miles per hour without figuring out the speed at which the modified Explorer would roll over. *See Daubert* Hr. Tr. 30:4-25. When asked by the Court about Hooker's seeming failure to follow the testing methodology Hooker claimed to be following—despite the suggestion on Hooker's forms that the tests should be run at 50 and 55 mph as well, *Daubert* Hr. Tr. 50:8-51:14-—Semones simply responded "that's a fair question." *Daubert* Hr. Tr. 51:13; *see also Daubert* Hr. Tr. 30:8 (same).

It is more than a fair question—it is a fatal one.  Semones is basing his opinion that a modified Ford Explorer would not have rolled over while performing accident avoidance maneuvers with an entrance speed of 70 mph on tests that were conducted at an entrance speed of 45 mph.[1]  Accordingly, the mere fact that the vehicle did not tip at lower speeds does not necessarily mean that it would not tip at higher speeds and more severe slip angles—particularly given that a vehicle's energy increases exponentially with increases in speed.  *Daubert* Hr. Tr. 96:16-18 (Ford's expert); *see also* 12:24-13:12 (Semones explaining "the amount of steering required to achieve a given lateral acceleration varies with the square of the speed that you're going").  And NHTSA testing establishes that even vehicles with a static stability factor above 1.2 can roll over.  *See Daubert* Hr. Tr. 81:22-82:3; *see also Daubert* Hr. Tr. 112:5-114:1 (Ford's expert testifying as to vehicles with a static stability factor above 1.2 tipping over in NHTSA testing); 114:24-115:23 (Ford's expert testifying regarding the Mickey Gilbert tip-up of a vehicle with a static stability factor over 1.2).

So the key question here is not whether the modified vehicle is *capable* of rolling over, but rather the speed at which it will do so.  Yet, Semones simply does not know the speed at which the modified Explorer would roll over, and he apparently had not even made an attempt to find out at the time of the *Daubert* hearing:

> THE COURT: But you don't know what speed that would be because the testing would only be at 45?

---

[1] It is important not to confuse the *entrance speed* of the Hooker tests with the speed of the vehicle during the entire test—the vehicle slows down throughout the Hooker test.  *See Daubert* Hr. Tr. 38:9-12.

THE WITNESS: I would have to look through the test data to see if I've got any others that are at a higher speed.

*Daubert* Hr. Tr. 32:10:10-13.  Needless to say, Semones's testimony that he might have seen a test somewhere, but he's not quite sure if he has something on point, does not qualify as a reliable methodology under *Daubert*.  *See Bell v. Foster Wheeler Energy Corp.*, No. 15-6394, 2017 WL 876983, at *3 (E.D. La. 2017) (excluding expert testimony when it "represent[s] little more than a guess").

Semones tries to defend his reliance on such tests by suggesting that tests conducted at lower speeds can predict vehicle behavior at higher speeds provided that the steering angles in the lower speed tests were sufficiently severe.  *See Daubert* Hr. Tr. 30:12-17.   But, as noted, higher speeds generate—all else being equal— significantly higher lateral forces on a vehicle's tires when that vehicle is turning.  *See Daubert* Hr. Tr. 12:24-13:12.

Thus, Semones's suggestion that the lower speed tests can mimic higher speeds depends on having—at the very least—some idea of the forces acting on the vehicle at the time of the rollover.  Otherwise, Semones has no idea whether the lower speed tests are predictive of the forces generated by higher speed maneuvers, and his opinion that the tests are predictive is simply an impermissible backdoor method of guessing the forces on the vehicle at the time of the crash.  *Cf. Bell v. Foster Wheeler Corp.*, No. 15-6394, 2016 WL 5916304, at *3 (E.D. La. 2016) (impermissible to use expert testimony "as a subterfuge" to smuggle unreliable speculation before the jury).

Semones admits he does not know any of the steering angles of the Explorer at the time of the accident.  *See Daubert* Hr. Tr. 12:20-22.  Semones further admits he

does not know the speed, slip angle, yaw rate, or the lateral acceleration of the Explorer at the time of the accident. *See Daubert* Hr. Tr. 73:6-11. Moreover, Semones admits he made no effort to find any of that information out:

EXAMINATION BY [FORD'S COUNSEL]:
Q. By the way, you can't tell His Honor whether that vehicle is literally swinging around broadside; you can't tell him whether it's a slight angle or 90-degree angle. That's the slip angle and you don't have any opinion about what that is, true?

A. No, I didn't – that's true. I did not calculate my own.

Q. Isn't it true, sir, that if we know the weight of a vehicle, and we know its speed, and we know its yaw rate, and we know its slip angle, we can make judgments about the forces that are acting on a vehicle, the lateral G's?

A. Yes.

Q. So when you know the lateral G's, you know how much force is being exerted on that vehicle to try to get it to roll over?

A. Yes.

. . . .

THE COURT: Okay. So why didn't do you it? So what if it's after your deposition? Why didn't you do it to be able to make this calculation that counsel is speaking about?

THE WITNESS: It's not typically then the kind of thing that I've . . . seen done to assess whether or not the vehicle was defective by design. *It's a fair question, though*.

THE COURT: Well, I hope it's a fair question. I'm not saying it to be unfair, but it seems to me the force involved is significant in determining exactly the position of the vehicle and what happened; is that a fair statement? Doesn't that help you recreate exactly what happened at the time of the accident?

THE WITNESS: Well, it wasn't my role to recreate what happened at the time of accident.

*Daubert* Hr. Tr. 72:13-73:2, 74:13-75:1 (emphasis added). Because Semones has no idea of the forces acting on the vehicle at the time of rollover accident—or what those forces would have been on the modified vehicle—his methodology of relying on tests conducted at a significantly lower speed to predict the behavior of the modified Explorer at 70 mph is unreliable given that (1) it is based on little more than speculation and (2) simple physics suggests that the forces on the vehicle may well have been significantly in excess of the forces generated in the lower-speed Hooker tests. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Further, Semones's inability to explain why Hooker made certain testing decisions when testing the modified Explorer provides an additional basis for determining that Semones's opinion is unreliable. Hooker's justification for not continuing to test beyond 45 mph is vital to judging whether Hooker's test results support Semones's opinion. If, for example, Hooker stopped testing because he thought the modified Explorer was going to roll over at 50 mph—whether for driver safety reasons or whether because he wanted the data to support the hypothesis that the modified Explorer would never roll over—both results would be devastating to Semones's the-modified-Explorer-would-not-have-rolled-over-at-70-mph theory. *Cf.* *Daubert* Hr. Tr. 30:12-17 (Semones testifying that he would not have been satisfied

if the tests had demonstrated that the modified Explorer would have rolled over at 48 mph).

Nonetheless, despite the importance of answering why Hooker stopped testing, Semones appears to have made no inquiry at all into why Hooker made certain testing choices.[2] That unblinking reliance on another expert's testing also renders Semones's methodology unreliable. *See, e.g.*, *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999) (expert's "unblinking" reliance on other experts is an unreliable methodology under *Daubert*). This Court will not permit Semones to be used as a device for getting unreliable test results by a non-testifying expert into Court. *See Dura Automotive Sys. of Ind.*, 285 F.3d 609, 612-13 (7th Cir. 2002) (experts should not simply "parrot" and serve as a "mouthpiece" for non-testifying expert).

### 2.

Semones attempted two hail marys at the *Daubert* hearing in order to save his opinion.

### i.

Semones points to other non-standardized Hooker tests—essentially Hooker driving around in a parking lot, maybe or maybe not trying to trip the modified vehicle up—that are performed by Hooker at speeds above 45 mph, *Daubert* Hr. Tr. 24:25-25:5, to suggest that the modified Explorer would not have rolled over.

---

[2] Robert Hooker is, to the best of Semones's knowledge, still alive. *See Daubert* Hr. Tr. 7:8-10.

Earlier in this case, Semones himself recognized the importance of standardized testing procedures when determining whether a vehicle was defective:

> The way I've always looked at it is I want to see how the vehicle performs in standardized test maneuvers.
> . . . . And — and I recognize there will be quibbling about steering rates and steering magnitudes and some of — some of the details of that. But if he can go out and take that vehicle in a test maneuver that I recognize as a legitimate standardized kind of event, that fits within a protocol, and make it roll over, then I'm going to evaluate it for the purposes of whether or not it's defectively designed.

R. Doc. No. 87-3, at 25 (Semones Dep. 95:6-18). Thus, before the *Daubert* hearing, Semones had been of the view that he was "not affirmatively seeking to offer [the non-standardized Hooker tests], I don't think," because he would need to "analyze the details of those a little bit more if that was to be my only basis for - for something." R. Doc. No. 87-3, at 25 (Semones Dep. 97:10-12). At the *Daubert* hearing, Semones gave no indication that he had performed that analysis. *Cf. Daubert* Hr. Tr. 25:8-14 (noting that the tests were only part of his "background" and Semones would have to locate tests).

The Court concludes that Semones's new opinions regarding the non-standardized Hooker tests are too unreliable to be admitted. In the first place, the Court has serious doubts as to whether Semones has ever performed the methodological inquiry that he himself suggested was necessary before he could base any opinions on them. But even if that hurdle could be overcome, the non-standardized Hooker tests would still be too unreliable here insofar as they appear to be based on no scientific or standardized methodology whatsoever. *See, e.g.*, *In re Mirena IUD Prods. Liability Litig.*, 169 F. Supp. 3d 396, 443 (S.D.N.Y. 2016) (*ad hoc*

testing weighs against admissibility under *Daubert*)). Finally, even if those prior two hurdles could somehow be overcome, Semones would still have the fundamental problem that he is relying on tests showing how a vehicle responds on *pavement* to predict the behavior of a vehicle sliding across *dirt and grass*:

> THE COURT: But my question was if that vehicle was put in the same scenario as in this case -- speed, weight, all of the different things we have been talking about, force, which I understand you didn't calculate -- how can you state with any degree of certainty that the modified Ford Explorer would not have rolled over if faced with the same situation as existed at the time of the accident or placed in the same situation as existed at the time of the accident?
>
> THE WITNESS: I think as a matter of steering inputs alone on *pavement*, the testing that I've seen is convincing to me and that's what I rely upon. In terms of, and -- I'm sorry –
>
> THE COURT: Go ahead. I'm saying the testing wasn't done under the same scenario. We've already talked about that, right?
>
> THE WITNESS: Yes, Your Honor. . . .

*Daubert* Hr. Tr. 86:9-24 (emphasis added); *see also Daubert* Hr. Tr. 13:16-17 (all Hooker tests were performed on pavement).

Having reviewed the entirety of the parties' submissions as well as hearing the oral testimony, the Court concludes that high speed, on-road testing is not a scientifically reliable method for predicting the behavior of cars traveling at high speed off-road because of the substantially different forces exerted on vehicles off-road. *See, e.g.*, *Daubert* Hr. Tr. 124:5-125:24. That, in turn, precludes Semones from being able to rely on those tests to buttress his otherwise unreliable opinion—based

on the too-slow Hooker standardized testing—that the modified Ford Explorer would not have rolled over had it been put in the same position.[3]

**ii.**

Finally, Semones also suggests that certain stability characteristics in the modified Ford Explorer would also permit it to avoid suffering from a similar accident:

> [A]s you increase the track width and overall stability of a vehicle you provide a greater level of control to the driver. In this case you had a couple of steers starting from several lanes over, a lowered and widened vehicle, which provides -- a more stable responding vehicle is going to put the vehicle at a slightly different position by the time -- if, indeed, it reaches the median -- by the time that it does. There will be a less severe position and, in all likelihood, would not have been as high of a slip angle, whatever that slip angle was. So it's entering the median in a more benign attitude.
>
> So even if there does come a point where it digs in significantly in furrow trips, it has bled off a lot of speed, it has gotten into that position where there is much more opportunities for the driver to be able to recover.

*Daubert* Hr. Tr. 87:2-22.  The Court concludes that Semones's opinion regarding the driver's potentially greater car control over the modified Explorer is too unreliable to be admissible.

First, it is unclear where exactly Semones is getting his opinion from or what methodology Semones used to generate his opinion that the driver of the modified vehicle would have materially different car control.  After all, even the unreliable, high speed, non-standardized Hooker tests suggest that the modified Ford Explorer would—at the very least—have been spinning out on the surface of I-10 before

---

[3] The same problem equally blocks any attempt by Semones to rely on any on-road testing of modified vehicles by Ford's experts.  *See Daubert* Hr. Tr. 37:7-12 (Semones discussing tests).

careening off-road. *Daubert* Hr. Tr. 25:4 (suggesting the modified Explorer would spin out "rather than rolling over"). A vehicle that is spinning out can hardly be said to be under the control of the driver. And, in any case, once the modified vehicle hits the grass, spinning, at high speed, Semones has really no basis at all to suggest that it would not roll over. *See Daubert* Hr. Tr. 77:25-78:2 (Semones explaining that any vehicle can roll over if furrow tripped). So the Court has little-to-no idea of what evidence Semones is basing his opinion on (or whether Semones is basing his opinion on any evidence whatsoever).

Second, even if Semones's opinion that a modified Ford Explorer would have been easier for Luis Eveler to control is reliable, that would not provide a sufficient basis for Semones's opinion that the modified Explorer would have somehow been able to avoid the exact same scenario. Again, Semones does not have any opinion regarding the forces that would be acting on the modified Ford Explorer:

> Q. One more thing, Mr. Semones. As you've described for the Court, you've even shown a side-by-side video of a modified Ford Explorer. You believe that vehicle was at 1.2 static stability factor?
>
> A. Yes.
>
> Q. Okay. If we took your suggestion of a 1.2 static stability factor Ford Explorer and all other things stayed the same, we just stuck it into this accident scenario, you still wouldn't know the forces that were acting on it at the edge of the pavement before it went into the median, would you?
>
> A.     That's true.

*Daubert* Hr. Tr. 75:3-13. Without a basis for judging what the forces might have been on the modified Explorer, Semones has no reliable basis for suggesting that the

supposedly, yet unspecified, improvement in yaw control would have resulted in a different outcome (let alone materially different outcome).

*     *     *

This Court finds that Semones's opinion that a modified Ford Explorer would have prevented or materially altered the accident is simply *ipse dixit* masquerading as science. The opinion will therefore be excluded under *Daubert* and Rule 702.

## IV.

Ford moves for summary judgment on the grounds that the Evelers cannot demonstrate a genuine dispute of material fact that—given how the Evelers' accident occurred—there is an alternative design for the Explorer that was capable of preventing the Evelers' injuries. As Ford's expert noted,

> So in one maneuver at one speed at 45 miles an hour you have one tip-up and one doesn't. What does it do at 70? What does it do across an Interstate?
> If we're coming into court and saying, if these modifications were put on this Explorer, this crash does not happen, that's how it's being used.
> Not only did we have a vehicle going across a roadway at 70, we have it going sideways when it leaves the road at 30 to 35 degrees of side slip into the median, and when you do that, *you roll over everything*.

*Daubert* Hr. Tr. 100:8-17 (emphasis added).

To establish the existence of "an alternative design for the product that was capable of preventing the claimant's damage," La. R.S. 9:2800.56, the Evelers must show "that the alternative design would have been significantly less likely than the chosen design to cause the damage for which the claimant has filed suit or that the alternative design would have significantly reduced such damage," John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev. 565, 597 (1989). As

such, to prevail against Ford's summary judgment, the Evelers must establish a genuine dispute of material fact as to whether the modified Explorer would have made it significantly less likely that the Evelers would have been injured or, at the very least, that the Evelers' injuries would be significantly reduced.

As explained, Semones's opinions that the modified Explorer would not have rolled over or that the modified Explorer would have rolled less severely are not admissible under Rule 702. Therefore, the plaintiffs cannot rely on Semones's opinions to establish a genuine dispute of material fact. *See Lee v. Offshore Logistical & Transport*, 859 F.3d 353, 355 (5th Cir. 2017) (explaining that the substance and/or content of summary judgment evidence must be admissible at trial, but noting that it need not be presented in a form that would be admissible for trial). And without Semones's testimony regarding the modified Explorer, the Evelers really have no evidence at all—and their brief in opposition to the motion for summary judgment does not appear to point to any[4]—that the modified Explorer would not have behaved in exactly the same manner as the Evelers' Explorer did off-road. At best, the Evelers can point to studies that something with a lower center of gravity would be more

---

[4] The Court notes that the Evelers' summary judgment brief attempts to incorporate multiple other pleadings. R. Doc. No. 100, at 1, 6. But, as this Court warned the parties earlier in this case, "this Court looks with extreme disfavor on motions that incorporate other motions." R. Doc. No. 34, at 1. After all, "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Therefore the Court deems any argument not raised in the body of the Evelers' summary judgment opposition to be waived. *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993) (explaining that unbriefed and insufficiently briefed arguments are waived). Notwithstanding that waiver, however, the Court has endeavored to respond to all the arguments that the Evelers have raised throughout this litigation.

resistant to rolling over on-road, but, again, those studies of on-road behavior do not establish a genuine dispute of material fact that the modified vehicle would have performed any differently off-road. Therefore, summary judgment is properly granted for Ford.

**V.**

Accordingly,

**IT IS ORDERED** that Ford's motion for summary judgment is **GRANTED**. Plaintiff's design defect claim against Ford is **DISMISSED WITH PREJUDICE**.


New Orleans, Louisiana, August 7, 2017.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**
